993 F.2d 1267
 61 USLW 2719
 Mark G.A. WELSH, a minor, and Elliott A. Welsh, his father
and next friend, Plaintiffs-Appellants,
v.
BOY SCOUTS OF AMERICA and Boy Scouts of America West
Suburban Council # 147, Defendants-Appellees.
 No. 92-1853.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 13, 1992.
Decided May 17, 1993.
 
 Richard Grossman (argued) Dannen, Crane, Heyman & Simon, Chicago, IL, for plaintiffs-appellants.
 Thomas D. Allen, Thomas E. Patterson, Wildman, Harrold, Allen & Dixon, Chicago, IL, George A. Davidson (argued), Carla A. Kerr, Hughes, Hubbard & Reed, New York City, for defendants-appellees.
 Before CUMMINGS and COFFEY, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.
 COFFEY, Circuit Judge.
 
 
 1
 Elliott Welsh and his seven year-old son Mark have brought suit asking the United States Courts to force the Boy Scouts of America to accept Mark as a member despite the fact that he refuses to comply with its Constitution and By-laws and affirm his belief in God. The Scouts refused Mark admission to membership in the scout troop and denied his father the opportunity to act as an adult partner. In their complaint, the plaintiffs allege that the defendant organization is a place of public accommodation practicing unlawful religious discrimination under Title II of the Civil Rights Act of 1964. 42 U.S.C. § 2000a (1988) (barring discrimination in places of public accommodation). This case presents a matter of first impression for the federal courts concerning the scope of Title II. See Welsh v. Boy Scouts of America, 787 F.Supp. 1511 (N.D.Ill.1992) ("Welsh II ".)[1] We affirm.
 
 I. BACKGROUND
 
 2
 The facts are undisputed: the district court opinion details fifty-two separate stipulated facts as well as twelve factual findings. Because the appellant does not challenge any of the trial court's factual findings, we accept those facts as true and decide only the issues of law.
 
 
 3
 The question before the court is whether Title II of the Civil Rights Act of 1964 bars the Boy Scouts of America from denying membership to any person who refuses to profess a belief in and duty to a Supreme Being. The plaintiffs sued the Boy Scouts alleging that a local Scout organization in the Chicago, Illinois area denied them membership because of the Welshes' refusal to recite the Boy Scout Membership Oath which requires scouts to express among other things a belief in God. The Oath states:
 
 
 4
 "On my honor I will do my best to do my duty to God and my country and to obey the Scout law, to help other people at all times, to keep myself physically strong, mentally awake and morally straight."
 
 
 5
 The plaintiffs argue that the defendant's exclusion of them from the Boy Scouts constitutes impermissible discrimination on the basis of religion in violation of Title II. Title II prohibits discrimination in public accommodations and states:
 
 
 6
 " § 2000a. Prohibition against discrimination or segregation in places of public accommodation.
 
 
 7
 (a) Equal access. All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.
 
 
 8
 (b) Establishments affecting interstate commerce or supported in their activities by State action as places of public accommodation; lodgings; facilities principally engaged in selling food for consumption on the premises; gasoline stations; places of exhibition or entertainment; other covered establishments. Each of the following establishments which serves the public is a place of public accommodation within the meaning of this title if its operations affect commerce, or if discrimination or segregation by it is supported by State action:
 
 
 9
 (1) any inn, hotel, motel, or other establishment which provides lodging to transient guests, other than an establishment located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his residence;
 
 
 10
 (2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the premises of any retail establishment; or any gasoline station;
 
 
 11
 (3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; and
 
 
 12
 (4) any establishment (A)(i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment."
 
 
 13
 42 U.S.C. § 2000a(a)-(b).
 
 II. DISCUSSION
 A. Place of Public Accommodation
 
 14
 The initial question before the court is whether Congress intended to govern organizations like the Boy Scouts within the statutory language "place of public accommodation" or "other place of ... entertainment?" 42 U.S.C. § 2000a(b). A reading of the statute for its plain meaning renders but one conclusion: Congress when enacting § 2000a(b) never intended to include membership organizations that do not maintain a close connection to a structural facility within the meaning of "place of public accommodation." The statute clearly governs only an entity that: (1) "serves the public" and (2) may be classified as an "establishment," "place," or "facility." Id.
 
 
 15
 Title II delineates the entities included therein as places, establishments, lodgings, and facilities. The statute also provides fifteen specific examples of regulated facilities, including inns, hotels, motels, restaurants, cafeterias, lunch rooms, lunch counters, soda fountains, retail establishments, gas stations, movie houses, theaters, concert halls, sports arenas, and stadiums. 42 U.S.C. § 2000a(b). None of the listed entities remotely resembles a membership organization. Despite this fact, the plaintiffs argue that the defendant organization is included under the language "other place of exhibition or entertainment." Id. § 2000a(b)(3). They claim that "the fact that [the Boy Scouts] offer entertainment to the public at various locations, all of which are 'places', ... subjects them to the strictures of Title II." Appellants' brief at 10. The clear language of the statute mandates a different conclusion, for we must always be cognizant of the fact that "the legislative purpose is expressed by the ordinary meaning of the words used." Richards v. United States, 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962). The statute in listing several specific physical facilities, sheds light on the meaning of "other place of exhibition or entertainment." This list reveals Congress' intent to regulate facilities as opposed to gatherings of people. Additionally, subsection (b)(4) refers only to physical structures such as buildings: "any establishment ... which is physically located within the premises of any establishment otherwise covered by this subsection, or ... within the premises of which is physically located any such covered establishment, ..." Id. § 2000a(b)(4). While the statute repeatedly refers to physical facilities it fails to refer to, much less delineate, anything resembling a membership organization or an association. The phrase "other place of exhibition or entertainment" does include facilities such as bowling alleys, golf courses, tennis courts, gymnasiums, swimming pools and parks, see, e.g., United States v. Lansdowne Swim Club, 713 F.Supp. 785 (E.D.Pa.1989), aff'd, 894 F.2d 83 (3rd Cir.1990) (applying Title II to a community swimming pool), but even a broad reading of the statute, as required in Daniel v. Paul, 395 U.S. 298, 308, 89 S.Ct. 1697, 1702, 23 L.Ed.2d 318 (1969), fails to encompass membership organizations whose purpose is not closely connected to a particular facility.
 
 
 16
 Consider as an analogy a hypothetical city ordinance requiring "the licensing of all dogs." It would be foolish to argue that the language of the ordinance also includes the licensing of cats. The plaintiffs' interpretation of Title II reaches out to include not another type of facility but rather a completely different type of entity (an organization of young boys in a group setting under adult leadership to foster respect for God, their country and their fellow man). The Boy Scouts is as different from the facilities listed in Title II as dogs are from cats.
 
 
 17
 Despite the clarity and specificity of the statute, the plaintiffs would have us believe that even though Congress focused on physical facilities, it also intended to regulate a wide spectrum of consensual human relationships. The plain meaning of the words in the statute renders this interpretation of Title II untenable. "The 'strong presumption' that the plain language of the statute expresses congressional intent is rebutted only in 'rare and exceptional circumstances,' when a contrary legislative intent is clearly expressed." Ardestani v. I.N.S., --- U.S. ----, ----, 112 S.Ct. 515, 520, 116 L.Ed.2d 496 (1991) (citation omitted). Congress has not expressed a contrary legislative intent regarding the scope of Title II. In fact, the United States Supreme Court, when interpreting the statute, stated that "the overriding purpose of Title II [is] 'to [re]move the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public.' " Daniel, 395 U.S. at 307-08, 89 S.Ct. at 1702 (quoting H.R.Rep. No. 914, 88th Cong., 1st Sess., 18) (emphasis added). It is only in this context--denial of access to public facilities--that courts must interpret Title II broadly. Id.
 
 
 18
 The dissent argues that because the 1990 Americans with Disabilities Act, 42 U.S.C.A. § 12,181 (West Supp.1992) (involving public accommodation), expands the number of establishments in its definition of "places of public accommodation," this court must expand Title II to include membership organizations.[2] This argument fails to recognize, that had Congress intended to include membership organizations lacking a close connection to a specific facility, it would have incorporated such a mandate in the Disabilities Act. On two separate occasions, in the original enactment (Title II of the Civil Rights Act of 1964) and now in the 1990 Disabilities Act, Congress saw fit not to include membership organizations. In the recently enacted Disabilities Act, Congress listed over fifty specific facilities subject to regulation, but did not include membership organizations lacking a close connection to a physical facility. See id. We refuse to read into the statute what Congress has declined to include. "[W]e must assume Congress understood the meaning of the words it incorporated into the [Act]." Jones v. Hanley Dawson Cadillac Co., 848 F.2d 803, 807 (7th Cir.1988). We as judges of the U.S. Court of Appeals have only the power to interpret the law; it is the duty of the legislative branch to make the law. We must "refuse[ ] to infringe on the legislative prerogative of enacting statutes to implement public policy.... 'The problems of public policy ... are for the legislature' and ... 'our job is one of interpreting statutes, not redrafting them.' " Wangen v. Ford Motor Co., 97 Wis.2d 260, 294 N.W.2d 437, 469 (Wisc.1980) (Coffey, J., dissenting) (quoting State v. Princess Cinema of Milwaukee, 96 Wis.2d 646, 292 N.W.2d 807, 815 (1980)).
 
 
 19
 The dissent has failed to point us to a single word in the statute that supports its theory that Congress intended to cover membership organizations lacking a close connection to a particular facility. Our colleague merely comments that, "if it is open to the public, it must be open to all the public." Dissent at 1281. This begs the question of whether the Boy Scouts "serve the public," and are to be considered an "establishment," "place," or "facility."
 
 
 20
 If the plaintiffs wish to change the law, the proper forum is the Congress of the United States where all interested parties will be entitled to engage in the full panoply of hearings and arguments before the congressional and senatorial committees. Only after Congress has had the opportunity for deliberation and reflection should a radical change of the nature the plaintiffs propose be enacted. See, e.g., In re Grabill Corp., 976 F.2d 1126, 1127 (7th Cir.1992) (Coffey, J., concurring); Wangen, 294 N.W.2d at 469 (Coffey, J., dissenting). Certainly, federal judges must not reach out and grasp at straws in an attempt to rewrite the laws duly enacted by the legislative branch of government, the Congress.
 
 
 21
 The trial court's thorough and well-reasoned opinion reviewed the state law cases interpreting state public accommodation statutes and discussed four cases holding that the Jaycees, a membership organization like the Boy Scouts, was not considered a "place of public accommodation." See Welsh II, 787 F.Supp. at 1523 (citing United States Jaycees v. Iowa Civil Rights Commission, 427 N.W.2d 450 (Iowa 1988); United States Jaycees v. Massachusetts Comm'n Against Discrimination, 391 Mass. 594, 463 N.E.2d 1151 (1984) ("MCAD "); United States Jaycees v. Richardet, 666 P.2d 1008 (Alaska 1983); United States Jaycees v. Bloomfield, 434 A.2d 1379 (D.C.App.1981)). The Massachusetts Supreme Court best summarized the reasoning of these cases with the following language:
 
 
 22
 "The MCAD's interpretation of [the statute] as including the U.S. Jaycees does not call for the mere addition of another physical 'site' to the statutory language, but instead it requires the addition of a type of 'conduct' (a non-profit organization's membership policy). Such an interpretation cannot be derived from the plain language or a reasonable construction of [the statute]."
 
 
 23
 MCAD, 463 N.E.2d at 1159. The Massachusetts Supreme Court and other courts have also made clear the difference between membership organizations such as Little League sports and the YMCA where membership merely serves as a means of access or a "ticket" to a physical location or a facility, and membership organizations such as the Jaycees and the Boy Scouts where membership entitles one to participate in group interactive activities irrespective of a facility. MCAD, 463 N.E.2d at 1159; Welsh II, 787 F.Supp. at 1524, 1530.
 
 
 24
 We are aware that certain state courts have in instances interpreted their respective state statutes dealing with public accommodation to cover organizations like the Boy Scouts. However, in all but two of those instances, the state public accommodation statute was far broader and more inclusive than the federal statute before us.[3] For cases interpreting broadly worded state public accommodation statutes, see Quinnipiac Council, Boy Scouts, Inc. v. Commission on Human Rights and Opportunities, 204 Conn. 287, 528 A.2d 352 (1987); Curran v. Mount Diablo Council of the Boy Scouts, 147 Cal.App.3d 712, 195 Cal.Rptr. 325 (1983); United States Jaycees v. McClure, 305 N.W.2d 764 (Minn.1981). For cases in which the state public accommodation statute was similar to Title II, see United States Power Squadrons v. State Human Rights Appeal Board, 59 N.Y.2d 401, 465 N.Y.S.2d 871, 452 N.E.2d 1199 (1983); National Organization for Women v. Little League Baseball, Inc., 127 N.J.Super. 522, 318 A.2d 33 (1974) ("NOW "). In NOW, the New Jersey Superior Court held that a Little League program which used public baseball fields and extended an open invitation to all boys of a certain age in the community at large constituted a place of public accommodation and thus could not discriminate against girls. Id. 318 A.2d at 37. In Power Squadrons, the New York Court of Appeals held an organization that trained men in water skills and used facilities in public schools, parks and waterways constituted a place of accommodation because it conducted public activities in public facilities and therefore could not refuse membership to women. 465 N.Y.S.2d at 874-76, 452 N.E.2d at 1202-04. Both NOW and Power Squadrons state that "place" "is a term of convenience, not of limitation." NOW, 318 A.2d at 37, Power Squadrons, 465 N.Y.S.2d at 875, 452 N.E.2d at 1203. We refuse to accept this interpretation. To conclude that Title II includes membership organizations like the Boy Scouts, one would have to assume that Congress' use of the term "place" was mere surplusage in the statute, and that the fifteen specific examples of places fail to illuminate the meaning of the term "place." The plaintiffs' and the dissent's interpretation of the term "place" fails to pay heed to the rule of statutory construction that "a court should not construe a statute in a way that makes words or phrases meaningless, redundant, or superfluous." Zimmerman v. North Am. Signal Co., 704 F.2d 347, 353 (7th Cir.1983). We agree with the decision of the Massachusetts Supreme Court in MCAD holding that an organization is only a "place of public accommodation" when the organization functions as a "ticket" to admission to a facility or location. MCAD, 463 N.E.2d at 1159; Welsh II, 787 F.Supp. at 1524, 1530.[4]
 
 
 25
 Several federal court opinions have held that Title II governs membership organizations that are closely connected to a facility or structure, but we have been unable to find, any case holding that Title II governs a membership organization like the Scouts whose purpose is not closely connected to a particular facility. See Smith v. YMCA of Montgomery, 462 F.2d 634, 636 (5th Cir.1972) (the YMCA operated gymnasiums, a health club and swimming pools); Nesmith v. YMCA of Raleigh, N.C., 397 F.2d 96, 99-100 (4th Cir.1968) (same); United States v. Lansdowne Swim Club, 713 F.Supp. 785, 790 (E.D.Pa.1989), aff'd, 894 F.2d 83 (3rd Cir.1990) (club operated a swimming pool); Durham v. Red Lake Fishing & Hunting Club, Inc., 666 F.Supp. 954, 959 (W.D.Tex.1987) (club owned 400 acres of land for hunting and fishing); United States v. Slidell Youth Football Ass'n, 387 F.Supp. 474 (E.D.La.1974) (a youth football league owned a recreational facility with fields, grandstand and a concession stand); Auerbach v. African Am. Teacher's Ass'n, 356 F.Supp. 1046, 1048 (E.D.N.Y.1973) (organization held public meetings in a public school auditorium); Wesley v. City of Savannah, 294 F.Supp. 698, 701-02 (S.D.Ga.1969) (city operated a public golf course and was barred from hosting a racially discriminatory golf tournament); Williams v. Rescue Fire Co., 254 F.Supp. 556, 563 (D.Md.1966) (a non-profit association operated a swimming pool and skating rink). In each of these cases, Title II was found applicable because the organization conducted public meetings in public facilities or operated facilities open to the public like swimming pools, gyms, sports fields and golf courses. In contrast, the trial court in the case before us found that the typical Boy Scout gathering involves five to eight young boys engaging in supervised interpersonal interaction in a private home. Welsh II, 787 F.Supp. at 1516. As previously explained, the plaintiffs seek not to add an additional facility within the scope of Title II but rather to add an activity, MCAD, 463 N.E.2d at 1159, and we have been unable to locate any case law suggesting that we construe the reach of Title II so expansively.
 
 
 26
 The plaintiffs and the dissent, just as the courts in NOW and Power Squadrons, argue (1) that the term "place" is merely a "term of convenience, not of limitation" and (2) that it would be quite difficult to draft the statute without the word "place." Dissent at 1280-81. This argument is likewise unpersuasive for "[t]his court has previously stated that the language of the statute is the most reliable indicator of congressional intent: 'It is that language which is chosen with the most care, subjected to the greatest scrutiny and actually voted on by Congress and signed by the President.' " United States v. Bell, 936 F.2d 337, 341 (7th Cir.1991) (quoting Monterey Coal Co. v. Federal Mine Safety and Health Review Comm'n, 743 F.2d 589, 595-96 (7th Cir.1984)). We fail to understand why the dissent claims that Congress was incapable of drafting the statute without the word "place." Congress could very easily have drafted the statute without using the word "place" and instead written "each of the following, if it serves the public, is a public accommodation within the meaning of this title ...," but Congress made a considerate and deliberate choice not to do so. As previously explained, "we must assume Congress understood the meaning of the words it incorporated into the [Act]." Jones v. Hanley Dawson Cadillac Co., 848 F.2d at 807. Congress could likewise have avoided using the word "place" in subsection (b)(3) with the following language "or any other public exhibition or entertainment...." Instead, Congress included the descriptive term "place" and proceeded to give concrete examples of specific places. It is obvious that the language of the statute reflects Congress' clear intention not to include membership organizations. See id.; see also Richards, 369 U.S. at 9, 82 S.Ct. at 591 ("the legislative purpose is expressed by the ordinary meaning of the words used"). It really isn't very difficult to interpret the true meaning of a statute when one reads the words for their plain and unambiguous meaning.
 
 
 27
 In an argument not advanced by the plaintiffs, the dissent relies on Hornick v. Noyes, 708 F.2d 321 (7th Cir.1983), cert. denied, 465 U.S. 1031, 104 S.Ct. 1295, 79 L.Ed.2d 696 (1984), for the proposition that Title II is applicable to the case before us. In Hornick, we held that Title II covers a YWCA that offered both permanent and temporary housing. Id. at 324. The dissent somehow twists this holding to mean that Title II regulates every imaginable membership organization. See Dissent at 1280 ("[t]his court has held that the Young Women's Christian Association is covered by Title II"). Just because Title II covers one YWCA which provides both permanent and overnight lodging does not ipso facto mean every YWCA is covered, much less every membership organization. Hornick does not even discuss membership, sharply distinguishing it from the case before us.[5] Moreover, the Hornick YWCA operated a building that served both as a permanent residence and also as an overnight hotel; this type of facility is expressly covered by Title II. See § 2000a(b). The dissent states that the only factor distinguishing Hornick from the case before us is that the YWCA "has a set physical location." We are of the belief that this is a significant and telling difference. While we do not dispute the fact that the YMCA, YWCA, (collectively the "Y") and the Boy Scouts share many of the same worthy attributes, Hornick clearly contains no precedential value for the case before us because Hornick involved the question of whether the denial of public accommodation in a facility that provided both temporary and permanent housing was proper.
 
 
 28
 In an attempt to expand the reach of Title II, the dissent contends that we are placing significance on the amount of rent the Boy Scouts pays for facilities it uses. See Dissent at 1280. We disagree with the dissent's interpretation of our holding, for it is of little significance how much rent is paid by the organization, if any. The key distinction between the the "Y" in Hornick and the case before us is the Boy Scouts lack of a close connection to any physical facility. The dissent misinterprets our holding to mean that a "Y" without overnight accommodations may discriminate while one that offers housing may not. Once again, this misses the point. A "Y" that operates a gymnasium with recreational and exercise equipment is also a facility. Without the gymnasium (a facility) the "Y" would be unable to serve its function thus Title II governs that facility. The Boy Scouts organization on the other hand, can and does function apart from any connection to a physical facility. The dissent fails to acknowledge this distinction because it misapprehends the nature of the Scouts. A prospective scout seeks admission into a group of young boys for social interaction, as opposed to entry into a hotel, restaurant or gymnasium. Conversely, a person goes to a "Y" to sleep, reside or exercise. Without the particular facility the individual's purpose would be thwarted.
 
 
 29
 I agree that Title II applies in the majority of tenancy situations as in Hornick, but Title II does not apply to a voluntary membership organization like the Boy Scouts in a factual situation of this nature. The dissent's interpretation of Hornick is much too broad and an exchange at oral argument underscores the radical implications of such an interpretation of Title II. The plaintiffs' counsel admitted that his reading of Title II would include an organization that was open to the public but met in a private home. He went so far as to state that his interpretation of the parameters of Title II would require an organization that studied Israeli culture and history to admit into their group (meeting in a private home) a neo-nazi who believed in, and was dedicated to, the destruction of Israel. Such absurd results can only be avoided by recognizing that a public accommodation as Congress defined in the statute must "serve the public." 42 U.S.C. § 2000a(b). Although the Boy Scouts organization does own and/or rent buildings used mainly for administrative purposes, this alone falls far short of transforming the Boy Scouts of America into a public accommodation. Thus the plaintiff and the dissent must look elsewhere for support of the argument that membership organizations that do not maintain a close connection to a particular facility to achieve their objectives are subject to Title II.
 
 
 30
 The dissent also argues that because any member of the particular scout troop is welcome in the private home of the troop leader on the evening of a meeting, for Title II purposes, that private home is no different than a restaurant. I assume the dissent is referring to a restaurant licensed to sell food and beverages, and with that I must take issue because a restaurant is expressly listed as being included within Title II. See 42 U.S.C. § 2000a(b)(2). The analogy of a private home to a restaurant must also fail for the reason that a private home owner may place many more restrictions on entry into his or her home than may a licensed public restaurant. For example, a parent hosting a Scout meeting certainly has the right to refuse entry into his or her home to any boy who is under the influence of alcohol, drugs, or carrying a weapon because in this country, "a man's home is his castle." Lombard v. Louisiana, 373 U.S. 267, 274, 83 S.Ct. 1122, 1126, 10 L.Ed.2d 338 (1963); City of Watseka v. Illinois Pub. Action Council, 796 F.2d 1547, 1571 (7th Cir.1986) (Coffey, J., dissenting), aff'd, 479 U.S. 1048, 107 S.Ct. 919, 93 L.Ed.2d 972 (1987).
 
 
 31
 A private home is not the type of facility governed under Title II, therefore the fact that the Scouts meet in a private home does not transform the Scouting organization into a place of public accommodation. See 42 U.S.C. § 2000a. The dissent concedes that the defendant organization is not a public accommodation when he states "the scout leader must unlock his home to all qualifying members." Dissent at 1280 (emphasis added). The requirement of qualification precludes the notion that the troop meeting is open to the public. More importantly, however, in 42 U.S.C. § 2000a(b)(1), Congress has expressly declared that a private residence in which the homeowner dwells does not become a public accommodation simply because the owner opens it to the public.[6] In fact, the owner may open his or her home for economic purposes such as a fundraiser for a charitable organization or renting out a room to a student and still not become a public accommodation. Congress, in federal legislation, has excluded from the definition of public accommodation "an establishment located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his residence." 42 U.S.C. § 2000a(b)(1). Based on this statutory language expressing Congress' clear intent to exclude private residences, I fail to understand how one can argue that the Boy Scouts organization becomes subject to the public accommodation statute because it meets in a private residence.
 
 
 32
 The Welshes and the dissent also maintain that merely because the Scouts move from one location to another is insufficient to exclude the organization from Title II. The dissent analogizes the Scouts to various modes of transportation such as airplanes, buses and trains and to a restaurant that transfers its licensed premises to set up a temporary booth in a park during a festival. See Dissent at 1280-81. We are not in agreement with this argument. First, the analogy lacks merit because a restaurant is expressly listed in subsection (b)(2) and thus covered by Title II as are forms of transportation under various provisions of the Civil Rights Act, whereas an organization of individuals with a qualified membership such as the Boy Scouts is not covered in Title II. Second, reference to airplanes, buses, trains and restaurants undermines the dissent's argument because each of those is a physical facility or structure whereas the Boy Scouts is a social membership organization and not a physical facility. The dissent goes on to argue that our holding requires the courts to assess a person's motive for joining an organization. This likewise is inaccurate. The question before the court is not "why did a person join?" but rather, "what did the person join?" In the case of the "Y," the Little League, and/or other organizations with a close connection to a physical facility, the person joins an entity that provides access to a recreational or residential facility (i.e., gymnasium, baseball field, housing or meeting hall). In the case of the Boy Scouts, a person joins a membership organization lacking a close connection to any physical facility. Congress made a clear distinction between entities that require a close connection to a particular facility to achieve their objective (such as hotels, restaurants, theatres, and sports arenas) and those that do not require such a connection. We are not at liberty to disregard that distinction. While it is true that "people" and not "places" are the source of discrimination, in Title II Congress focused exclusively on prohibiting discrimination in places of public accommodation and not in every conceivable social relationship. In various other legislative enactments, Congress has addressed discrimination in places other than public accommodations such as housing, employment, education, and public transportation. The only question before this court, however, is whether a membership organization such as the Boy Scouts of America is covered by Title II.
 
 
 33
 Our conclusion that Title II does not govern the Boy Scouts of America is supported by one further rationale. The Boy Scouts, in the operation of the troop, does not require a particular physical facility, for its purpose is to train young boys to respect God, their country and their fellow man, while developing a good moral character. The Boy Scouts is a participative organization, the young boys come to engage in social activity and interact with each other. The dissent counters that "the Scouts do meet in a place; meetings are not held in outer space." Dissent at 30. This assertion by the dissent is nothing but an attempt to expand the reach of Title II. The statute does not govern every imaginable "place," it only regulates public facilities such as motion picture houses, theaters, concert halls, sports arenas, and stadiums. See 42 U.S.C. § 2000a(b)(3). Title II was never intended to govern a Boy Scout meeting in a private residence, out in the wilderness, in a church, or in "outer space" as the dissent writes. Thus for the reasons stated we conclude that Title II of the Civil Rights Act of 1964 does not govern membership organizations which do not bear a close connection to a particular "establishment," "place," or "facility".B. Private Club Exception
 
 
 34
 As explained above, the Boy Scouts organization is excluded from the operation of Title II because subsection (b) does not cover a membership organization whose purpose is not closely connected to a particular facility. The district court declined to extend its analysis beyond this inquiry because it found that "[m]embership organizations per se, which do not operate from or supply access to a particular facility or location, do not qualify as 'places of public accommodation' within the meaning of Title II." Welsh II, 787 F.Supp. at 1541. Because we conclude that the defendant organization does not constitute a public accommodation, it should be unnecessary to discuss whether it satisfies the private club exception. However, the dissent has argued that the Boys Scouts is not a private club, thus we are compelled to respond to its analysis.
 
 
 35
 The inquiry into the private club exception involves a consideration of several factors. The Welshes and the Boy Scouts as well as the district court (Welsh I ) have relied on Lansdowne Swim Club, 713 F.Supp. at 796-97, which provides a list of seven factors to weigh in determining whether an entity qualifies as a private club. The seven factors are: (1) the genuine selectivity of the group; (2) the membership's control over the operations of the establishment; (3) the history of the organization; (4) the use of facilities by nonmembers; (5) the club's purpose; (6) whether the club advertises for members; and, (7) whether the club is nonprofit or for profit. Id. We, likewise, will examine these factors.
 
 
 36
 In construing the private club exception of Title II, courts have properly placed great weight on the first factor, that of selectivity. See, e.g., Tillman v. Wheaton-Haven Rec. Ass'n, 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973). The dissent deduces that the Boy Scouts of America is not truly a private club because it has over five million members and advertises for new members through the public school system. This type of analysis casts aside an important aspect of selectivity that the Supreme Court has emphasized. The Supreme Court requires that there be a "plan or purpose of exclusiveness. " Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 236, 90 S.Ct. 400, 404, 24 L.Ed.2d 386 (1969) (emphasis added). The Court has applied this analysis on several occasions and held that racial discrimination of itself does not constitute a "plan or purpose of exclusiveness." For instance, in Sullivan the Court determined that a community park permitting only white "members" was not truly private because "[i]t is open to every white person within the geographic area, there being no selective element other than race." Id.; see also Tillman, 410 U.S. at 438, 93 S.Ct. at 1094 (denying private club status to nonprofit corporation operating a community swimming pool). In Daniel, 395 U.S. 298, 89 S.Ct. 1697, the Supreme Court reviewed a whites-only "club" that required a twenty-five cent membership fee and had admitted over 100,000 "members." The Court concluded that the " 'membership' device seems no more than a subterfuge designed to avoid coverage of [Title II]." Id. at 302, 89 S.Ct. at 1699. Such is not the case of the Boy Scouts. Although the Scouts intentionally admit a large number of boys from diverse backgrounds, admission to membership is not without the exercise of sound discretion and judgment. This is evident from the Constitution and By-laws as well as the Boy Scouts Oath and Scout Law. The Oath reflects the commitment of each member, and has remained unchanged since the publication of the Scouts first handbook in 1911. The Oath reads:
 
 
 37
 "On my honor I will do my best to do my duty to God and my country and to obey the Scout law, to help other people at all times, to keep myself physically strong, mentally awake and morally straight."
 
 
 38
 This Oath offers a clear statement of the beliefs, principles and purpose of the Scouts, i.e., to nurture belief in God, respect for one's country and his fellow man, and being of good moral character. In order to maintain these principles, it is essential that the Scouts exercise selectivity. No one argues that the Oath of membership was adopted as a "subterfuge" to avoid the effects of Title II. Indeed, such an argument would be foolish given the longevity of the Oath. Moreover, the Oath evidences both a plan and purpose of selectivity. Sullivan, 396 U.S. at 236, 90 S.Ct. at 404. The distinction between the Scouts' selectivity and that of the park or swimming pool that excludes non-Caucasians is self-evident. The purpose of a swimming pool or tennis court is to allow one to participate in recreation, and both Caucasians and non-Caucasians are capable of swimming and playing tennis. The purpose of Scouting, however, is to equip youth of all races, colors and creeds to fulfill their duty to God, to mature personally, and to help others. This can only be achieved by a boy who believes in God. How does one who denies the very existence of a Supreme Being presuppose to follow the Oath of the Boy Scouts of America? We hold therefore that the Scouts organization not only is selective, but that its very Constitution, By-laws and doctrine dictate that it remain selective.
 
 
 39
 The importance and longevity of the principles enunciated in the Scout Oath are also dispositive of two other Lansdowne Swim Club factors. The fourth factor considers the history of the club. The Scouting organization was founded in 1907 in England. The Constitution and By-laws of the World Organization of the Scout Movement contain three tenets: duty to God, duty to one's fellow man, and duty to oneself. Welsh II, 787 F.Supp. at 1515. The Constitution requires all members to adhere to the Scout Oath and to the Scout Law. Based on well-reasoned precedent, we refuse to construe Title II to require that an organization such as the Boy Scouts of America abandon its principles which have stood the test of time, having endured for more than eighty some odd years. The very purpose of the private club exception is to preserve the right of truly private organizations to maintain their unique existence.
 
 
 40
 The fifth factor addresses the purpose of the organization's existence. As previously discussed, the purpose of the Scouts is to train young boys to live according to the principles of duty to God, duty to others, and duty to oneself. The Boy Scouts of America would be unable to carry out its very purpose if the government, through Title II, required it to accept members who deny a condition of membership, that is, the belief in God. Finally, the seventh Lansdowne Swim Club factor also favors the private club status of the Scouts: they are a nonprofit organization. Thus four of the seven Lansdowne Swim Club factors strongly support the conclusion that the Boy Scouts indeed is a private club entitled to exception from Title II.
 
 
 41
 The dissent concludes that because the Boy Scouts have five million members, and are open to "as many boys as will join,"[7] it is neither selective nor private. Dissent at 1282. This conclusion not only exaggerates the facts, it ignores the purpose of the Scouts' existence and punishes the Boy Scouts for its success in recruiting future quality leaders of society. Certainly Congress did not intend to condition the private club exclusion from Title II on the popularity of the organization. The more pertinent factor regarding selectivity is the nexus between the organization's purpose and its membership requirements. Even if we were to agree for the purpose of argument that the Boy Scouts of America is a public accommodation, the law is most clear that it is entitled to exemption from Title II because it is a private club.
 
 
 42
 Obviously the discussion of the Boy Scouts' purpose and its right to determine whom to admit into membership impacts a constitutional right to Freedom of Association. However, because we decide this matter on the statutory grounds, we need not, and indeed should not, address the constitutional questions presented. "Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the court will decide only the latter." Indiana Port Comm'n v. Bethlehem Steel Corp., 835 F.2d 1207, 1210 (7th Cir.1987) (quoting Ashwander v. Valley Authority, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936)).[8]III. CONCLUSION
 
 
 43
 We hold that Title II does not apply to the Scouting organization because it is not an "establishment" that "serves the public," thus it is not a "place of public accommodation." Likewise, the Boy Scouts does not constitute a "place of exhibition or entertainment" in the sense Congress envisioned when drafting Title II. Man is a human being who has a sociological need to join with others in order to develop his full being and to fulfill his need for companionship as well as enjoyment. Congress, in drafting Title II certainly did not intend to interfere with the development of the whole man.
 
 
 44
 Even if we were to agree for the purpose of argument that the Boy Scouts is a public accommodation, Congress expressly excluded private clubs such as the Scouts from the operation of the statute. The Boy Scouts of America qualify as a private club because its Constitution and Oath contain requirements that serve to purposefully exclude nonqualifying applicants. Because this dispute may properly be resolved on statutory grounds, there is absolutely no need to address the constitutional issues. Ashwander, 297 U.S. at 347, 56 S.Ct. at 483; Indiana Port Comm'n, 835 F.2d at 1210.
 
 
 45
 A great deal is at stake in the interpretation of statutes such as Title II. The Founding Fathers recognized that a republic cannot endure without a virtuous citizenry. Successful self-government requires that citizens willingly participate in public affairs, make sacrifices for the common good, curb their selfishness, and join in taking responsibility for themselves and others. The central question for those concerned about maintaining the health of our republic must be, "how do individuals acquire the virtues necessary for self-government?" History provides only one answer: through the institutions of civil society, like the family, religious groups, and voluntary associations, which inculcate a sense of moral values in the young. Throughout its eighty-six years of existence, the Boy Scouts have successfully presented its combination of educational, social, athletic, craft, wilderness training and outdoor activities to our young people. The leadership of many in our government is a testimonial to the success of Boy Scout activities. In recent years, single parent families, gang activity, availability of drugs and other factors have increased the dire need for support structures like the Scouts. When the government, in this instance through the courts, seeks to regulate the membership of an organization like the Boy Scouts in a way that scuttles its founding principles, we run the risk of undermining one of the seedbeds of virtue that cultivate the sorts of citizens our nation so desperately needs. Such a momentous and potentially costly a decision should be made by the people's elected representatives, the U.S. Congress, only after thoughtful deliberation, consideration and debate about its consequences. It is a decision to be made in the legislative halls and not by the judicial branch of government.
 
 
 46
 It is interesting to note that the challenged Boy Scout Oath is strikingly similar to the one expressed by our Founding Fathers on July 4, 1776 in the Declaration of Independence which reads in part "And for the support of this Declaration, with a firm reliance on the protection of Divine Providence, we mutually pledge to each other our Lives, our Fortunes and our sacred Honor." Certainly this Court must not upset such enduring principles by stretching beyond recognition a statute drafted to guarantee equal access to public facilities.
 
 
 47
 AFFIRMED.
 
 
 48
 CUMMINGS, Circuit Judge, dissenting.
 
 
 49
 As everyone (or almost everyone) knows, Boy Scouts must be trustworthy, loyal, helpful, friendly, courteous, kind, obedient, cheerful, thrifty, brave, clean and reverent. They must also, according to the organization's constitution and by-laws, believe in God. This last requirement leaves out a seven-year old from Hinsdale, Illinois named Mark Welsh who wanted to join the Tiger Cubs but who, along with his father Elliott Welsh, refuses to recite an oath pledging allegiance to a Supreme Being. The question in this case, then, involves a membership organization's power to draw a circle around itself that excludes atheists and agnostics. Although the majority opinion arguably reaches the correct result, I believe it does so in a most unfortunate fashion: by imparting a stingy and narrow reading to the remedial statute at issue, Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a ("Title II"). The majority's interpretation of Title II would leave the Boy Scouts and other like organizations free to discriminate not just against atheists--or those whose beliefs arguably conflict with the group's most central philosophy--but against anyone at all on sheer whim. Under the majority's analysis, a group such as Rotary International or the Jaycees or Little League is, absent a more comprehensive state statute, perfectly free to exclude blacks, Jews, Catholics, etc. Rather than unduly narrow the reach of Title II, I would hold that the statute does prevent discrimination by membership organizations. This does not necessarily mean that the Boy Scouts could be forced to admit atheists, however, because the First Amendment protects organizations from having to accept those who do not share its most elementary beliefs.[1] Yet the majority never reaches the constitutional question because of its treatment of Title II. As a result, I dissent.[2]
 
 
 50
 Title II holds that "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a(a).[3] Included in the definition of public accommodations are "place[s] of * * * entertainment," 42 U.S.C. § 2000a(b)(3), a definition I believe encompasses membership organizations including the Boy Scouts.
 
 
 51
 Before turning to the majority's analysis, it is worth noting the arguments that have not been offered to justify this discrimination against atheists. No one has suggested, for example, that non-believers are not protected under Title II's ban on religious discrimination. Indeed, the Supreme Court has held that:
 
 
 52
 the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all. This conclusion derives support * * * from recognition of the fact that the political interest in forestalling intolerance extends beyond intolerance among Christian sects--or even intolerance among "religions"--to encompass intolerance of the disbeliever and the uncertain.
 
 
 53
 Wallace v. Jaffree, 472 U.S. 38, 53-54, 105 S.Ct. 2479, 2487-2488, 86 L.Ed.2d 29 (1985). Nor does the majority argue that Scouting operations do not affect commerce and so may not be regulated by the federal government. As the district court observed, the Boy Scouts supplied $13 million worth of uniforms, publications and other paraphernalia in one recent year, much of which moved in interstate commerce (including a Tiger Scout T-shirt and Scout leader's cap mailed to the Welshes through a J.C. Penney catalog). Welsh v. Boy Scouts of America, 787 F.Supp. 1511, 1520-1521 (N.D.Ill.1992). This is enough of a tie to interstate commerce under the Supreme Court's generous definition of the term. See Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942); Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964).
 
 
 54
 As I understand the majority's analysis, there are four reasons why the Scouts are not covered by Title II. The first is that the statute, which delineates a series of establishments to be regulated (fifteen examples are given) and makes no mention of either the Boy Scouts or membership organizations, should be read as evidence of congressional intent to exclude rather than to include. With all respect, this substitutes the conclusion for the analysis. Of course the statute does not say "Boy Scouts"--if it did this case would be easy. The case is hard because the law is ambiguous and the precise question we must decide, which the majority manages to avoid by talking about "plain language," is whether the phrase "place of * * * entertainment" includes membership organizations; that the rest of Title II is silent with respect to Boy Scout-like organizations hardly seems relevant.
 
 
 55
 The majority's second argument rests on the absence of case law, and Judge Coffey faults me for failing to find any federal appellate decision holding that a membership organization is covered by Title II. True enough. But neither has the majority pointed to any federal appellate decision holding that a membership organization is not covered. This proves only that the issue has not come up before; it gives no clues as to its proper resolution. In this case, a tie may well go to the plaintiff since we have been repeatedly instructed by the Supreme Court to interpret the statute liberally. Daniel v. Paul, 395 U.S. 298, 308, 89 S.Ct. 1697, 1702, 23 L.Ed.2d 318 (1969); Miller v. Amusement Enterprises, Inc., 394 F.2d 342, 349 (5th Cir.1968) (en banc). In Roberts v. United States Jaycees, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), for example, a case not mentioned by the majority, the Supreme Court upheld the application of a Minnesota statute nearly identical to Title II to the Jaycees, although the Court was not called on to interpret the statute.[4] And in Board of Directors of Rotary Intern. v. Rotary Club of Duarte, 481 U.S. 537, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987), also not mentioned by the majority, the Court held that Rotary International must admit women as members under a broadly written California law.[5] Again, the Court did not have to interpret the statute, but Justice Powell's opinion for the Court emphasized that "public accommodations laws 'plainly serv[e] compelling state interests of the highest order,' " id. at 549, 107 S.Ct. at 1948 (quoting Roberts, 468 U.S. at 624, 104 S.Ct. at 3253), and said that "[i]n Roberts we recognized that the State's compelling interest in assuring equal access to women extends to the acquisition of leadership skills and business contacts as well as tangible goods and services." Id.; see also New York State Club Ass'n, Inc. v. City of New York, 487 U.S. 1, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988) (upholding state public accommodation laws' application to private clubs). Although these cases did not involve Title II, the Court clearly signalled that public accommodation statutes generally are to be interpreted broadly.[6]
 
 
 56
 The majority's third and meatiest argument is that the Boy Scouts cannot qualify as a "place of * * * entertainment" because they are not a "place." This reasoning has a kind of facial, common sense appeal, but it simply cannot stand up under serious scrutiny. This Court has held that the Young Women's Christian Association is covered by Title II. Hornick v. Noyes, 708 F.2d 321 (7th Cir.1983), certiorari denied, 465 U.S. 1031, 104 S.Ct. 1295, 79 L.Ed.2d 696 (1984) (citing Nesmith v. YMCA of Raleigh, N.C., 397 F.2d 96 (4th Cir.1968) and Stout v. YMCA of Bessemer, Ala., 404 F.2d 687 (5th Cir.1968)). The majority contends that the key distinction between the Scouts and the Young Women's or Young Men's Christian Association (collectively the "Y") is that the Y sometimes offers overnight accommodations and is much closer to the paradigmatic motel or restaurant covered by Title II. Yet Hornick did not emphasize this point and, indeed, there are many Y's that do not rent rooms by the night or serve food to the public. It is absurd to suggest that these Y's are free to violate Title II, or that the Y, though prohibited from discriminating in its overnight accommodations, could restrict access to its other facilities on the basis of race, religion, creed or national origin.
 
 
 57
 It should be incumbent on the majority to explain why our decision in Hornick does not dictate the same result in the case of the Boy Scouts, since the Y is also a membership organization. Admittedly, the Y has a set physical location. It owns a building and is a "place" as the word is commonly used. But of course the Scouts also meet in a place; meetings are not held in outer space (a place in its own right). The Scouts may not own the places at which they meet, yet a party's lack of ownership does not exempt an establishment from Title II. See, e.g., Heart of Atlanta Motel v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) (motel is covered under Act without regard to ownership of property). Nor can it be significant that younger groups of Scouts may meet in private homes (but not always--monthly meetings are held in church basements and civic halls for which, presumably, rent has sometimes been paid). Since there is no talismanic significance to a house as opposed to a stand-alone commercial property--after all, restaurants operating out of the chef's home are not free to discriminate because the proprietor lives upstairs--this argument must rest on the fact that no rent is paid. The significance of this distinction completely eludes me.
 
 
 58
 The concern about rent appears to be directed at a deeper and more legitimate concern; i.e., that the homes of Scout leaders are not truly open to the public in the same sense as, say, a shoe store. Yet a boy who belongs to a Scout den is, in fact, free to enter the Scout leader's home on the night of the meeting. In other words, a house where a troop meeting is held ceases to be a private dwelling; for that limited time, the house is as open to the public as the Scout organization itself. Just as a restaurant need not admit customers when the "closed" sign is hanging in the window, but must admit all customers when the "open" sign is displayed, so too must the Scout leader unlock his home to all qualifying members.
 
 
 59
 Another possible difference between the Scouts and the Y is that the Scouts move from one "place" to another. Yet to read the statute to require a fixed locale would exclude trains, buses, airplanes, traveling circuses--or anything that doesn't have pilings driven into the earth. Under this interpretation, a restaurant that sets up a booth in the park during a festival would be privileged to deny service to people based on skin color. This cannot be so. The majority eventually rests on the notion that people join the Y to use its facilities while children become Boy Scouts for "social interaction." According to the majority, "[t]he key distinction between the Y in Hornick and the case before us is the Boy Scouts lack of a close connection to any physical facility." The problem with this analysis is that courts are not in a position to figure out the motives of those who join organizations; that is, whether they belong only to use facilities or whether they seek social connections. Many people not otherwise given to exercise, for example, join the Y precisely because it is a center of social and business interaction. And what would the majority make of the motives of youngsters who enter Little League? That organization has no set location, like the Boy Scouts, and children benefit from the same kind of social interaction that binds the Scouts. But Little Leaguers need a facility too--baseball is not much of a game without a diamond.
 
 
 60
 In short, even assuming that the word "place" has the critical status and limiting importance in Title II suggested by the majority, I cannot identify a principled distinction between membership organizations such as the Boy Scouts that meet in varying locales and other organizations that use or own one facility. The word "place" simply cannot bear the stress that has been heaped on it by the majority. That Title II should turn on the definition of "place" is irrational because places do not discriminate; people who own and operate places do. And there is no basis to believe that those who operate facilities at fixed locales, as opposed to those who operate membership organizations from varying locales, are more deserving targets of civil rights regulation. To put so much emphasis on this one word in isolation is to fall into the trap we recently warned against in Herrmann v. Cencom Cable Associates, Inc.:
 
 
 61
 Statutes have meanings, sometimes even "plain" ones, but these do not spring directly from the page. Words are arbitrary signs, having meaning only to the extent writers and readers share an understanding. * * * Language in general, and legislation in particular, is a social enterprise to which both speakers and listeners contribute, drawing on background understandings and the structure and circumstances of the utterance. Slicing a statute into phrases while ignoring their contexts--the surrounding words, the setting of the enactment, the function a phrase serves in the statutory structure--is a formula for disaster.
 
 
 62
 978 F.2d 978, 982 (7th Cir.1992). The more logical and contextual reading of Title II is that "place" is a mere "term of convenience, not of limitation," because the word as it is commonly used does encompass most of what is open to the public. National Org. for Women, Essex County Chapter v. Little League Baseball, Inc., 127 N.J.Super. 522, 318 A.2d 33, 37 (App.1974), affirmed, 67 N.J. 320, 338 A.2d 198 (1974). The difficulty of drafting a statute without resort to the term "place" is obvious if one tries to find a suitable substitute in such phrases as "place of accommodation" and "place of * * * entertainment."
 
 
 63
 The impetus behind Title II was to aid the black traveler in the South for whom "the road may be more like a desert and each inviting sign a mirage or, worse yet, a humiliating rebuff to him, his family or companions," Welsh, 787 F.Supp. at 1535 (quoting 110 Cong.Rec. 1642 (February 1, 1964) (remarks of Rep. Ryan)). But it is also clear that Congress targeted discrimination well beyond that suffered by African Americans moving in inhospitable territories. Lawmakers sought to eradicate discrimination in all things open and available to the general population. The meaning, if not the language, of Title II is simple and unambiguous enough: if it is open to the public, it must be open to all the public.
 
 
 64
 The majority's final argument is that even if the Scouts are a "place" covered by Title II, they are exempt under the statute's exception for private clubs. Yet the majority is clearly swimming upstream in suggesting that an organization of five million people in the United States alone may qualify as a private club. There is no single test to determine whether a club or organization is private. Nesmith, 397 F.2d at 101. Courts look at many factors including an organization's size, the open-ended character of its membership rolls, its history, and its selectiveness, United States v. Lansdowne Swim Club, 894 F.2d 83, 85-86 (3rd Cir.1990); Wright v. Salisbury Club, Ltd., 632 F.2d 309, 312-313 (4th Cir.1980); Nesmith, 397 F.2d at 101-102, and judges must be skeptical in evaluating claims of private club status. See Tillman v. Wheaton-Haven Recreation Ass'n, Inc., 410 U.S. 431, 438, 93 S.Ct. 1090, 1094, 35 L.Ed.2d 403 (1973) (swimming and recreational club is not private because membership is open to all whites in geographic area, despite membership cap and required approval of new applicants by existing members); Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 236, 90 S.Ct. 400, 404, 24 L.Ed.2d 386 (1969) (hunting establishment is not private because it has "no plan or purpose of exclusiveness"); Daniel, 395 U.S. at 302, 89 S.Ct. at 1699 (recreational facility could not claim private status despite charging a membership fee).
 
 
 65
 Though there are no allegations in this case that the Scouts concocted requirements to avoid the civil rights laws as in Daniel, 395 U.S. at 302, 89 S.Ct. at 1699, the organization has few features that would mark it as a private club. Membership is not selective. Any child of the appropriate age (and of course sex) with a parent's permission can join so long as he is willing to recite an oath, pay a small fee, and pledge to attend meetings. As the flyer that sparked Mark Welsh's interest in the Scouts stated flatly, "YOU CAN JOIN TIGER CUBS, BSA, IF YOU ARE IN THE FIRST GRADE." There is no limit on the number of boys who may join, unlike Tillman where the organization did offer a fixed number of memberships and still did not qualify as a private club. 410 U.S. at 438, 93 S.Ct. at 1094. In fact, the Scouts advertise for new members. See Wright, 632 F.2d at 312 (active solicitation of members belies private club claim). Other than the mention of God in the oath, which must exclude an extremely small--though indeterminate--number of children, the only substantive requirement for membership is age, which is not so much a matter of selectivity as a basic common denominator. Age is similar to the geographic requirement in Tillman, 410 U.S. at 438, 93 S.Ct. at 1094, and Sullivan, 396 U.S. at 236, 90 S.Ct. at 404, that did not convert those associations into private clubs. Since the Boy Scouts have five million members in the United States and are committed to admitting as many boys as will join, the Scouts cannot be considered either selective or private. The majority's expansion of this exception is too extreme to be acceptable.
 
 
 66
 Though I believe the Boy Scouts are covered by Title II, the inquiry should not end there because the First Amendment protects groups from having to admit those who do not share their most fundamental beliefs. The right of association is among the most precious of liberties guarded by the Bill of Rights, United Mine Workers of America, District 12 v. Illinois State Bar Ass'n, 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967); De Jonge v. Oregon, 299 U.S. 353, 364, 57 S.Ct. 255, 259, 81 L.Ed. 278 (1937). In my opinion, the majority erred in failing to reach this constitutional issue.
 
 
 67
 My inclination would have been to hold that the Scouts could exclude atheists under a line of free association decisions suggesting that individuals may form groups in the pursuit of political, social, economic, educational, religious and cultural ends. Roberts, 468 U.S. at 622, 104 S.Ct. at 3252. See NAACP v. Claiborne Hardware Co., 458 U.S. 886, 907, 102 S.Ct. 3409, 3422, 73 L.Ed.2d 1215. (1982). "[B]y collective effort individuals can make their views known, when, individually, their voices would be faint or lost." Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley, 454 U.S. 290, 294, 102 S.Ct. 434, 436, 70 L.Ed.2d 492 (1981). The Scouts would suffer just the type of injury the First Amendment was designed to prevent if forced to admit members who refuse to subscribe to the organization's basic philosophy. This is so for three reasons. First, the reference to God in Scouting tradition is reflected in a series of oaths--the most basic expression of a group's principles. If anything should receive First Amendment protection, it is an oft-recited statement that reflects values deeply embedded in the organization.[7] Second, the references to God in the Scout oaths seemingly are not proxies for a deeper and more base desire to exclude those who are different or threatening. The Boy Scout oath has since its inception eighty years ago included an affirmance of duty to God--unlike, for example, the Pledge of Allegiance, which garnered its reference to God in 1954. Act of June 14, 1954, ch. 297, 68 Stat. 249 (codified at 36 U.S.C. § 172). The Boy Scout oath is so central that former Scouts, years after they have forgotten how to tie a knot or start a fire with scraps of wood, can still recite its lines from memory. Third, there are genuine differences of belief between those who do not believe in God's existence and those who do; these differences are basic enough that a group may choose to define itself in some measure by this distinction. In this sense, the discrimination by the Scouts against atheists is less heinous than the unexamined sexual stereotypes behind the exclusion of women from the Jaycees in Roberts and from Rotary International in Rotary.
 
 
 68
 Because the Boy Scouts are not religious in any real sense, however, and belief in God is at best implicit in most Scouting activities, this case presents a particularly vexing challenge to the rights of free association. This is especially so after the Supreme Court's decisions in Roberts and Rotary, which undertook a searching and not terribly deferential review of the justifications organizations use to limit membership. I regret that the majority has avoided grappling with these issues, and particularly regret that it has done so by unduly constricting the reach of a remedial civil rights statute: Title II. For these reasons, I must respectfully dissent.
 
 
 
 [1]
 The district court also issued a pre-trial ruling denying the defendant's motion for dismissal. See Welsh v. Boy Scouts of America, 742 F.Supp. 1413 (N.D.Ill.1990) (Welsh I )
 
 
 [2]
 In the Americans with Disabilities Act, 42 U.S.C.A. § 12,181 (West Supp.1992), Congress specifically delineated the scope of the term "accommodation":
 "(7) Public accommodation
 The following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce--
 (A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor,
 (B) a restaurant, bar, or other establishment serving food or drink;
 (C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;
 (D) an auditorium, convention center, lecture hall, or other place of public gathering;
 (E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;
 (F) a laundromat, dry-cleaner, bank, barber shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office or a health care provider, hospital, or other service establishment;
 (G) a terminal, depot, or other station used for specified public transportation;
 (H) a museum, library, gallery, or other place of public display or collection;
 (I) a park, zoo, amusement park, or other place of recreation;
 (J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;
 (K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and
 (L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation."
 Id.
 
 
 [3]
 It is clear that Congress drafted Title II with more restricted language than many if not all of the state public accommodation statutes. See Welsh II, 787 F.Supp. at 1538
 
 
 [4]
 The dissent faults the majority for failing to discuss Roberts v. United States Jaycees, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), and Board of Directors of Rotary Int. v. Rotary Club, 481 U.S. 537, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987). These two cases are of no precedential value because: (1) both cases involved broadly worded state statutes; and (2) in neither case was the Court required to interpret the state statute in question. Thus, citation to Roberts and Rotary Club is of no value when determining the meaning of the more narrowly worded federal statute (Title II)
 
 
 [5]
 It appears that the YWCA in Hornick offered housing to anyone who could pay the rent. See Hornick, 708 F.2d at 322-26
 
 
 [6]
 The statute provides in part:
 "(b) ... Each of the following establishments which serves the public is a place of public accommodation within the meaning of this title ... if its operations affect commerce, or if discrimination or segregation by it is supported by State action:
 (1) any inn, hotel, motel, or other establishment which provides lodging to transient guests, other than an establishment located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his residence....
 42 U.S.C. § 2000a(b)(1).
 
 
 [7]
 The dissent is mistaken on this point. As previously explained, the Boy Scouts exercises discretion in its membership selection. If the organization was open to "as many boys as will join," it would not have excluded the plaintiffs and this lawsuit would never have been filed. In fact the very flyer the dissent relies upon to support its argument states:
 "One goal of the Tiger Cubs, BSA, is for you and your boy to have fun together. Another is to strengthen bonds within the family. Ideals such as personal fitness, reverence for God, love of country, and caring for others are also part of the program."
 
 
 [8]
 The dissent also points out that the plaintiffs' lack of belief in a Supreme Being does not exclude them from Title II's prohibition against religious discrimination and that the defendant organization is subject to Title II because its activities affect commerce. See Dissent at 1278. Because of our holding that the defendant organization is not a "place of public accommodation," it is unnecessary to address First Amendment Freedom of Religion or the Commerce Clause
 
 
 [1]
 Curiously, the district court wrote two lengthy and strongly worded, even passionate, opinions which come to completely opposite conclusions. At the pre-trial stage the judge found as a preliminary matter that "case law makes it clear that Title II does apply to membership organizations," that defendants satisfy the "place of public accommodation" clause, and that the Boy Scouts are subject to the anti-discrimination provisions of Title II. 742 F.Supp. 1413, 1422 (N.D.Ill.1990). Nearly two years later, after a bench trial, the district court found that the Scouts do not qualify as a place of public accommodation under the statute because "they do not operate from or avail their members of access to a particular facility or location." 787 F.Supp. 1511, 1541 (N.D.Ill.1992). Since this case involves primarily legal not factual questions, it is unclear what occurred during the trial to cause such a remarkable change in the district court's reasoning
 
 
 [2]
 This dissent disagrees with the "place" analysis in the majority opinion but does not disturb the result reached in the district court
 
 
 [3]
 Since Title II does not address sexual discrimination, the result I advocate would not force the Scouts to admit females
 
 
 [4]
 The Minnesota public accommodations law provided:
 It is an unfair discriminatory practice:
 To deny any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation because of race, color, creed, religion, disability, national origin or sex.
 Roberts, 468 U.S. at 615, 104 S.Ct. at 3248 (quoting MINN.STAT. § 363.03, subd. 3 (1982)).
 
 
 [5]
 The California Act provides in part:
 All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, or national origin are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.
 Rotary, 481 U.S. at 541-542 n. 2, 107 S.Ct. at 1943-1944 n. 2 (quoting Cal.Civ.Code Ann. § 51 (West 1982)).
 
 
 [6]
 A number of state courts and district courts interpreting state laws have considered the meaning of "place" in public accommodation statutes. See, e.g., National Organization for Women, Essex County Chapter v. Little League Baseball, Inc., 127 N.J.Super. 522, 318 A.2d 33 (1974), affirmed, 67 N.J. 320, 338 A.2d 198 (1974) (little league baseball is "place of accommodation"); United States v. Slidell Youth Football Ass'n, 387 F.Supp. 474 (E.D.La.1974) (football league is "place of accommodation"); Quinnipiac Council, Boy Scouts of America, Inc. v. Commission on Human Rights and Opportunities, 204 Conn. 287, 528 A.2d 352 (1987) (Boy Scout organization is "place of accommodation"); but cf., United States Jaycees v. Massachusetts Commission Against Discrimination, 391 Mass. 594, 463 N.E.2d 1151 (1984) (Jaycees organization is not "place of accommodation"); Kiwanis Intern. v. Ridgewood Kiwanis Club, 806 F.2d 468 (3d Cir.1986), certiorari dismissed, 483 U.S. 1050, 108 S.Ct. 362, 97 L.Ed.2d 812 (1987) (Kiwanis organization is not "place of accommodation"). Since these cases are not binding, they need not be discussed in detail
 In addition, the latest public accommodation statute, found in the 1990 Americans With Disabilities Act, includes an expanded number of establishments in its definition of "places" of public accommodation. See 42 U.S.C. § 12181. This latest example of congressional drafting does not reveal whether the Boy Scouts meet at a "place" under Title II any more than do the Supreme Court's decisions in Roberts and Rotary. However, it is instructive that in the ADA Congress has taken note of the broader interpretations given Title II in many courts and seemingly approved the thrust of this case law by offering its own expanded definition of public accommodations.
 
 
 [7]
 Bryant v. Zimmerman, 278 U.S. 63, 49 S.Ct. 61, 73 L.Ed. 184 (1928), is inapposite. That case upheld a New York statute requiring any incorporated association which demanded an oath as a condition of membership to, among other things, disclose its membership. However, the statute in Bryant was directed at the Ku Klux Klan and the decision was "based on the particular character of the Klan's activities, involving acts of unlawful intimidation and violence." NAACP v. Button, 371 U.S. 415, 465, 83 S.Ct. 328, 354, 9 L.Ed.2d 405 (1963)