**Saad NOAH, Plaintiff,**

v.

**AOL TIME WARNER INC. and America Online, Inc., Defendants.**

**No. CIV.A. 02–1316–A.**

United States District Court, E.D. Virginia, Alexandria Division.

May 15, 2003.

Saad S. Noah (pro se), Crest Hill, IL, for Plaintiffs.

Patrick J. Carome, Samir Jain, Charles Colin Rushing, Wilmer Cutler & Pickering, Washington, DC, for Defendants or Respondents.

## MEMORANDUM OPINION

ELLIS, District Judge.

Plaintiff, on behalf of himself and a class of those similarly situated, sues his Internet service provider (ISP) for damages and injunctive relief, claiming that the ISP wrongfully refused to prevent participants in an online chat room from posting or submitting harassing comments that blasphemed and defamed plaintiff's Islamic religion and his co-religionists. Specifically, plaintiff claims his ISP's failure to prevent chat room participants from using the ISP's chat room to publish the harassing and defamatory comments constitutes a breach of the ISP's customer agreement with plaintiff and a violation of Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a *et seq.*

At issue on a threshold dismissal motion are

(i) the now familiar and well-litigated question whether a claim, like plaintiff's, which seeks to hold an ISP civilly liable as a publisher of third party statements is barred by the immunity granted ISP's by the Communications Decency Act of 1996, 47 U.S.C. § 230,

(ii) the less familiar, indeed novel question whether an online chat room is a "place of public accommodation" under Title II, and

(iii) the rather prosaic question whether plaintiff's breach of contract claim is barred by the very contract on which he relies, namely the Member Agreement contract.

For the reasons that follow, plaintiff's claims do not survive threshold inspection and must therefore be dismissed.

## I.[1]

Plaintiff Saad Noah, a Muslim, is a resident of Illinois and was a subscriber of defendant America Online, Inc. ("AOL")'s Internet service until he cancelled the service in July of 2000. AOL, which is located in the Eastern District of Virginia, is, according to the complaint, the world's largest Internet service provider, with more than 30 million subscribers, or "members," worldwide. Defendant AOL Time Warner Inc. is the parent company of AOL.

Among the many services AOL provides its members are what are popularly known as "chat rooms." These occur where, as AOL does here, an ISP allows its participants to use its facilities to engage in real-time electronic conversations. Chat room participants type in their comments or observations, which are then read by other chat room participants, who may then type in their responses. Conversations in a chat room unfold in real time; the submitted comments appear transiently on participants' screens and then scroll off the screen as the conversation progresses. AOL chat rooms are typically set up for the discussion of a particular topic or area

---

1. The facts recited here are derived from the complaint and taken as true for purposes of resolving the dismissal motion at bar. *See*

*Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 783 (4th Cir.1999).

of interest, and any AOL member who wishes to join a conversation in a public chat room may do so.

Two AOL chat rooms are the focus of plaintiff's claims: the "Beliefs Islam" chat room and the "Koran" chat room. It is in these chat rooms that plaintiff alleges that he and other Muslims have been harassed, insulted, threatened, ridiculed and slandered by other AOL members due to their religious beliefs. The complaint lists dozens of harassing statements made by other AOL members in these chat rooms on specified dates, all of which plaintiff alleges he brought to AOL's attention together with requests that AOL take action to enforce its member guidelines and halt promulgation of the harassing statements. The statements span a period of two and one-half years, from January 10, 1998 to July 1, 2000, and are attributable to various AOL chat room participants only by virtue of a screen name. A representative sample of the reported offensive comments follows:

(i) On January 10, 1998 the AOL Member with the screen name "Aristotlee" wrote "islam is meaniglessssss thought," "allahsdick cut offffffffff," "dumballah bastard," "allah asssssshole," "allajs dick is in holy dick place hey." "FUCK AL-LAH," etc.

(ii) On April 26, 1998, "Twotoneleg" wrote "I HATE MUSLIMS," "THE KORAN SUCKS," etc., and "BOSS30269" wrote "I LIKE SHOOT-ING MUSLIMS," "I WILL BOMB THE MIDDLE EAST," and "FUCK IS-LAM."

(iii) On November 4, 1998, "Hefedehefe" wrote "SMELLY TOWEL HEADS" and "MUSLIM TOWEL HEADS."

(iv) On July 11, 1999, "Jzingher" wrote "The Koran and Islam are creations of Satan to distract people from the true faith which is Judaism. Mohammed was

merely a huckster who found a simple people he could manipulate."

(v) On July 18, 1999 "SARGON I" wrote "Qura'n lies about everything-a Satan made verses of darkness and destruction!", "Mohammed was no shit, only a killer, thief, a liar and a adulterer!", and "BYE STUPID MUSLIMS....ALL GO TO HELL."

(vi) On July 1, 2000, "DXfina3000 wrote "muslims suck," "they suck ass," "korans is use to wipe ass," "fuckin muslins," and "well allah can suck my dick you peice of ass."

Plaintiff understandably complained about these offensive, obnoxious, and indecent statements, initially through the channels provided by AOL for such complaints and eventually through emails sent directly to AOL's CEO Steve Case. Plaintiff alleges that although he reported every one of the alleged violations to AOL, AOL refused to exercise its power to eliminate the harassment in the "Beliefs Islam" and "Koran" chat rooms. Moreover, plaintiff contends that AOL gave a "green light" to the harassment of Muslims in these forums, claiming that such harassment was not tolerated in chat rooms dealing with other subjects and faiths. In protest, plaintiff cancelled his AOL account in July 2000. Plaintiff further alleges that other Muslim members of AOL have also complained to AOL about similar harassing statements.

The relationship between AOL and each of its subscribing members is governed by the Terms of Service ("TOS"), which include a Member Agreement and the Community Guidelines. The Member Agreement is a "legal document that details [a member's] rights and obligations as an AOL member," and it requires, *inter alia,* that AOL members adhere to AOL's standards for online speech, as set forth in the

Community Guidelines. These Guidelines state, in pertinent part, that

> ... You will be considered in violation of the Terms of Service if you (or others using your account) do any of the following: ....
>
> \* Harass, threaten, embarrass, or do anything else to another member that is unwanted. This means: ... don't attack their race, heritage, etc....
>
> \* Transmit or facilitate distribution of content that is harmful, abusive, racially or ethnically offensive, vulgar, sexually explicit, or in a reasonable person's view, objectionable. Community standards may vary, but there is no place on the service where hate speech is tolerated.
>
> \* Disrupt the flow of chat in chat rooms with vulgar language, abusiveness, ...

The Member Agreement states that AOL has the right to enforce these Community Guidelines "in its sole discretion." In response to a violation, "AOL may take action against your account," ranging from "issuance of a warning about a violation to termination of your account." AOL's Community Action Team is responsible for enforcing the content and conduct standards and members are encouraged to notify AOL of violations they observe online. Importantly, however, the Member Agreement states that AOL members "... also understand and agree that the AOL Community Guidelines and the AOL Privacy Policy, including AOL's enforcement of those policies, are not intended to confer, and do not confer, any rights or remedies upon any person."

Plaintiff filed this *pro se* action on September 3, 2002, claiming that AOL's al-

leged refusal to intervene to stop the harassing statements and enforce the TOS constitutes (i) discrimination in a place of public accommodation, in violation of Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a, and (ii) a breach of AOL's TOS and the Member Agreement. The action purports to be a class action, brought on behalf of plaintiff and all others similarly situated.

In addition to these claims raised in the complaint, plaintiff seems to assert a third claim against defendants in his response to the motion to dismiss, where he alleges new facts concerning several incidents involving disciplinary actions taken by AOL against plaintiff and other, unnamed Muslim AOL members. Although the nature of the incidents is not entirely clear, plaintiff alleges that AOL discriminated against plaintiff and other Muslim AOL members by issuing false warnings against them and terminating their accounts in an effort to silence their pro-Islam speech. Plaintiff alleges his own AOL account was briefly terminated by AOL and subsequently reinstated, but his past messages were not restored. Relying on these incidents, plaintiff belatedly claims a violation of his First Amendment rights and of the First Amendment rights of similarly situated Muslims. Although not properly pled in the complaint, given plaintiff's *pro se* status this claim will nonetheless be considered on this motion to dismiss as if it had been raised in the original complaint.[2]

Defendants AOL and AOL Time Warner filed a motion to dismiss plaintiff's claims on January 22, 2003. Nearly a month later, two days before the motion

---

**2.** While it is true, as courts have uniformly noted, that *pro se* plaintiffs' pleadings should be charitably read, it is not and should not be the task of courts to sift through the facts alleged in a complaint to advise *pro se* plaintiffs of what claims they might have. *See*

*Weller v. Dep't of Soc. Serv. for the City of Baltimore,* 901 F.2d 387, 391 (4th Cir.1990) (noting that "the 'special judicial solicitude' with which a district court should view such *pro se* complaints does not transform the court into an advocate").

was noticed for a hearing, plaintiff belatedly requested and ultimately received, as a matter of grace, an extension of time until March 7, 2003, in which to file his response. *See Noah v. AOL Time Warner, Inc.,* Civil Action No. 02–1316–A (E.D.Va. February 20, 2003) (Order). Plaintiff missed this deadline as well, filing his response on March 10, 2003. Thereafter, defendants filed their reply on March 17, 2003. Because the issues and governing authorities are adequately set forth in the pleadings, oral argument is unnecessary and may be dispensed with, and this motion is appropriately disposed of on the papers.

## II.

As an initial matter, it must be noted that plaintiff, as a *pro se* litigant, may not pursue his claims as a class action for the obvious and sensible reason that a *pro se* plaintiff is simply not equipped by reason of training or experience to take on the responsibility of litigating the claims of others. As the Fourth Circuit noted in this regard, "the competence of a layman representing himself" is "clearly too limited" to allow him to "risk the rights of others" by representing a class of plaintiffs. *Oxendine v. Williams,* 509 F.2d 1405, 1407 (4th Cir.1975). Accordingly, plaintiff cannot assert his claims as a class action representing all similarly situated Muslim AOL members.

## III.

[2] Next, it is appropriate to address whether AOL's parent, AOL Time Warner, is a proper defendant in this case. That it is not a proper party is manifestly apparent from the complaint itself. There

is no reference whatever in the complaint to any acts or conduct by AOL Time Warner alleged to be violative of any legal duty owed to plaintiff. Nor from the facts alleged does there appear to be any plausible basis for plaintiff to claim that AOL Time Warner is liable. *See supra* n. 2. In these circumstances, therefore, plaintiff has not stated a claim against AOL Time Warner and AOL Time Warner must be dismissed as a defendant in this case.

## IV.

Plaintiff's Title II claim fails for two alternate and independent reasons. First, plaintiff's claim against AOL is barred because of the immunity granted AOL, as an interactive computer service provider, by the Communications Decency Act of 1996, 47 U.S.C. § 230. Second, plaintiff's claim fails because a chat room is not a "place of public accommodation" as defined by Title II, 42 U.S.C. § 2000a(b). Each dismissal ground is separately addressed.

## A.

The question presented at the threshold is whether AOL has been granted statutory immunity against plaintiff's Title II claim. Section 230 states, in relevant part, that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).[3] Thus, the "plain language" of § 230 "creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." *Zeran v. America Online, Inc.,* 129 F.3d 327, 330 (4th Cir.1997), *cert denied,* 524

---

**3.** Section 230 defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access to multiple users

to a computer server, including specifically a service or system that provides access to the Internet . . ." 47 U.S.C. § 230(f)(2).

U.S. 937, 118 S.Ct. 2341, 141 L.Ed.2d 712 (1998).[4] In other words, " § 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role," and "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone, or alter content—are barred." *Id.* By specific statutory exclusion, certain causes of action are not barred by § 230; namely, causes of action based on (i) federal criminal statutes, (ii) intellectual property law, (iii) state law "that is consistent with this section," and (iv) the Electronic Communications Privacy Act of 1986. 47 U.S.C. §§ 230(e)(1)-(4).

Congress's purpose in providing such immunity is evident. As the Fourth Circuit noted in *Zeran*, ISPs such as AOL have millions of users who generate a "staggering" amount of content or information; thus it is "impossible for service providers to screen each of their millions of postings for possible problems." *Id.* at 331. If ISPs faced tort liability for information posted through their services by third parties, they might be forced to restrict access to their public forums. *Id.* Such a result would be counter to the statutory purpose of ensuring that the Internet remain a "forum for true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." *Id.* at 330; 47 U.S.C. § 230(a)(3). Thus, while parties that post information in Internet forums remain accountable under all applicable federal and state laws, they cannot be reached indirectly through the imposition of liability on the ISPs that serve as intermediaries in posting the information. *See Zeran,* 129 F.3d at 330.

Here, there is no question that § 230 bars plaintiff's Title II claim. First, the parties agree, as they must, that AOL is an "interactive computer service provider" as defined by § 230. AOL is clearly an "information service" that "provides ... access by multiple users to a computer server" and "provides access to the Internet." 42 U.S.C. § 230(f)(2). Second, all of the reported chat room statements are "information provided by another information content provider." 42 U.S.C. 230(c)(1). Individual AOL members, not AOL itself, created the content of the reported chat room statements. *See, e.g., Green v. America Online,* 318 F.3d 465, 470 (3d Cir.2003) (holding that chat room messages written by an AOL member are information "provided by another information content provider"). Finally, it is also clear that plaintiff's Title II claim "treats" AOL as the "publisher" of information provided by another.

■ Yet, relying on the fact that his claim is brought under Title II, not state defamation or negligence law, plaintiff contends that the claim treats AOL as the owner of a place of public accommodation, not a "publisher." This argument, though novel, is unpersuasive. An examination of the injury claimed by plaintiff and the remedy he seeks clearly indicates that his Title II claim seeks to "place" AOL "in a publisher's role," in violation of § 230. *Zeran,* 129 F.3d at 330. Thus, plaintiff contends that AOL is liable for its refusal to intervene and stop the allegedly harassing statements, and requests an injunction requiring AOL to adopt "affirmative measures" to stop such harassment,

---

**4.** *Zeran's* interpretation of § 230 has been widely followed by other courts. *See, e.g., Green v. America Online,* 318 F.3d 465, 471 (3d Cir.2003); *Ben Ezra, Weinstein, & Co. v. America Online, Inc.,* 206 F.3d 980, 986 (10th Cir.2000); *Blumenthal v. Drudge,* 992 F.Supp. 44 (D.D.C.1998).

presumably by screening out the offensive statements and banning the members responsible for them. These allegations make clear that plaintiff seeks to hold AOL liable for its failure to exercise "a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content." *Id.* As such, they are barred by § 230, for as the Fourth Circuit made clear in *Zeran,* all suits seeking to place a service provider in a publisher's role in this manner are barred under § 230. *Id.; see also Green,* 318 F.3d at 470 (holding that "holding AOL liable for its alleged negligent failure to properly police its network for content transmitted by its users … would 'treat' AOL 'as the publisher or speaker' of that content").

Plaintiff's further attempts to argue that his Title II claim is beyond the reach of § 230 are similarly unavailing. First, plaintiff argues that § 230 immunity does not apply to claims brought under federal civil rights statutes. Yet, this argument runs counter to § 230's expansive language, which plainly reaches such claims. Significantly, this expansive language grants a broad immunity limited only by specific statutory exclusions, none of which is applicable here. Only four classes of claims are excluded: claims involving a "Federal criminal statute," "any law pertaining to intellectual property," "any State law that is consistent with this section," and "the Electronic Communications Privacy Act." 47 U.S.C. § 230(e)(1)-(4). Plaintiff's claim fits into none of these exclusions.

Nor can it be plausibly argued that § 230 is limited to immunity from state law claims for negligence or defamation. Such a limitation is flatly contradicted by § 230's exclusion of some specific federal claims. Those exclusions would be superfluous were § 230 immunity applicable only to certain state claims. Moreover, the exclusion of federal *criminal* claims, but not federal civil rights claims, clearly indicates, under the canon of *expressio unius est exclusio alterius,* that Congress did not intend to place federal civil rights claims outside the scope of § 230 immunity. In short, Congress's decision to exclude certain claims but not federal civil rights claims as a group, or Title II specifically, must be respected. *See TRW, Inc. v. Andrews,* 534 U.S. 19, 28, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) (noting that "[w]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent").[5]

Second, plaintiff argues, unpersuasively, that § 230 does not apply to claims for injunctive relief, relying on *Mainstream Loudoun v. Board of Trustees of the Loudoun Cty. Library,* 2 F.Supp.2d 783, 790 (E.D.Va.1998). This reliance is misplaced. *Loudoun* held that "the 'tort-based' immunity to 'civil liability'" described by § 230 did not apply to the action in that case for "declaratory and injunctive relief." *Id.* (citing *Zeran,* 129 F.3d at 330). Yet, *Loudoun* is not only readily distinguishable from the instant case,[6] its continuing au-

---

5. Plaintiff argues that providing ISPs immunity against federal civil rights is bad policy. Yet, it is not the role of the federal courts to second-guess a clearly stated Congressional policy decision. *See Blumenthal,* 992 F.Supp. at 51–52 (determining the scope of immunity under § 230 according to the statute as enact-

ed, and rejecting an individualized policy argument).

6. In *Loudoun,* the plaintiffs brought suit against the library's board, alleging that the library's use of site-blocking software to prevent accessibility to adult web sites violated their First Amendment rights. *Id.* at 787. Thus, *Loudoun* presented a situation where a

thority is questionable. Subsequent courts have not followed *Loudoun* in limiting § 230 immunity to claims for liability only, but have found § 230 applicable to claims seeking injunctive relief as well. *See Ben Ezra*, 206 F.3d at 983–986 (applying § 230 to claims for injunctive relief); *Smith v. Intercosmos Media Group, Inc.*, 2002 WL 31844907 (E.D.La. Dec.17, 2002) (holding that § 230 provides immunity from claims for injunctive relief); *Kathleen R.*, 104 Cal. Rptr.2d at 781 (same). Indeed, given that the purpose of § 230 is to shield service providers from legal responsibility for the statements of third parties, § 230 should not be read to permit claims that request only injunctive relief. After all, in some circumstances injunctive relief will be at least as burdensome to the service provider as damages, and is typically more intrusive.

In sum, § 230 bars plaintiff's claim under Title II because it seeks to treat AOL as the publisher of the allegedly harassing statements of other AOL members. To be sure, the offensive statements plaintiff complains of are a far cry from the "diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity" that § 230 is intended to promote and protect. 47 U.S.C. § 230(a). Indeed, the statements reported by plaintiff suggest a darker side

of what has been called the "robust nature of Internet communication." *Zeran*, 129 F.3d at 330. Nonetheless, § 230 reflects Congress's judgment that imposing liability on service providers for the harmful speech of others would likely do more harm than good, by exposing service providers to unmanageable liability and potentially leading to the closure or restriction of such open forums as AOL's chat rooms. *Id.* at 331. Accordingly, under § 230, plaintiff may not seek recourse against AOL as publisher of the offending statements; instead, plaintiff must pursue his rights, if any, against the offending AOL members themselves.

**B.**

█ Even assuming, *arguendo*, that plaintiff's Title II claim is not barred by § 230, it must nonetheless be dismissed for failure to state a claim because AOL's chat rooms and other online services do not constitute a "place of public accommodation" under Title II.

Title II provides that "[a]ll persons shall be entitled to full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color,

---

government entity claimed immunity against a constitutional challenge to its regulation of Internet access. As noted in *Loudoun*, § 230 was enacted to keep the vibrant Internet market "unfettered by federal or state regulation," not to insulate government regulation of Internet speech from constitutional challenges, and thus immunity in such a situation was singularly inappropriate. *Id.* at 789–90, 47 U.S.C. § 230(b)(2). Here, unlike *Loudoun*, the plaintiff seeks to hold a service provider responsible for the statements of its members, a situation that fits within the core intended purpose of § 230 immunity.

Furthermore, *Loudoun* involved a different provision of § 230 from the one at issue here,

namely § 230(c)(2), which provides that no service provider "shall be held liable" for actions taken in good faith to restrict access to obscene or otherwise objectionable material. 47 U.S.C. § 230(c)(2). This liability language could be construed as not applicable to claims for an injunction. By contrast, § 230(c)(1), which is applicable here, contains no such liability language, instead simply stating that "[n]o provider ... of an interactive computer service shall be treated as the publisher" of third-party content. 47 U.S.C. § 230(c)(1); *see Kathleen R. v. City of Livermore*, 87 Cal.App.4th 684, 104 Cal.Rptr.2d 772 (2001) (distinguishing *Loudoun* on these grounds).

religion, or national origin." 42 U.S.C. § 2000a(a). Title II defines a "place of public accommodation" as follows:

Each of the following establishments which serves the public is a place of public accommodation within the meaning of this subchapter ...

(1) any inn, hotel, motel, or other establishment which provides lodging to transient guests, other than an establishment located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his residence;

(2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the premises of any retail establishment; or any gas station;

(3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; and

(4) any establishment (A)(i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment.

42 U.S.C. § 2000a(b).

The theory of plaintiff's Title II claim is that he was denied the right of equal enjoyment of AOL's chat rooms because of AOL's alleged failure to take steps to stop the harassing comments and because of AOL's warnings to plaintiff and brief termination of plaintiff's service. In this regard, plaintiff contends that the chat rooms are "place[s] of ... entertainment" and thus within the public accommodation definition. 42 U.S.C. § 2000a(b)(3). Yet, as the relevant case law and an examination the statute's exhaustive definition make clear, "places of public accommodation" are limited to actual, physical places and structures, and thus cannot include chat rooms, which are not actual physical facilities but instead are virtual forums for communication provided by AOL to its members.

Title II's definition of "places of public accommodation" provides a list of "establishments" that qualify as such places. This list, without exception, consists of actual physical structures; namely any "inn, hotel, motel, ... restaurant, cafeteria, lunchroom, lunch counter, soda fountain, ... gasoline station ... motion picture house, theater, concert hall, sports arena [or] stadium." 42 U.S.C. § 2000a(b)(1)-(3). In addition, § 2000a(b)(4) emphasizes the importance of physical presence by referring to any "establishment ... which is *physically located* within" an establishment otherwise covered, or "within ... which" an otherwise covered establishment "is *physically located.*" 42 U.S.C. § 2000a(b)(4) (emphasis added). Thus, in interpreting the catchall phrase "other place of exhibition or entertainment" on which plaintiff relies, the statute's consistent reference to actual physical structures points convincingly to the conclusion that the phrase does not include forums for entertainment that are not physical structures or locations. 42 U.S.C. § 2000a(b)(3); *see Welsh v. Boy Scouts of America,* 993 F.2d 1267, 1269 (7th Cir. 1993) (holding that the statute, "in listing several specific physical facilities, sheds light on the meaning of 'other place of ... entertainment'"); *Clegg v. Cult Awareness Network,* 18 F.3d 752, 755 (9th Cir.1994) (holding that, by its plain language, Title

II covers only "places, lodgings, facilities and establishments open to the public").

As the Supreme Court has held, § 2000a(b)(3) should be read broadly to give effect to the statute's purpose, namely to eliminate the "daily affront and humiliation" caused by "discriminatory denials of access to *facilities* ostensibly open to the general public." *Daniel v. Paul*, 395 U.S. 298, 306, 307–08, 89 S.Ct. 1697, 23 L.Ed.2d 318 (1969) (holding that an amusement park with facilities for swimming, boating, miniature golf, and dancing is a "place of entertainment" under Title II) (emphasis added). This broad coverage stems from a "natural reading of [the statute's] language," which should be "given full effect according to its generally accepted meaning." *Id.* As such, it is clear that the reach of Title II, however broad, cannot extend beyond actual physical facilities. Given Title II's sharp focus on actual physical facilities, such as inns, motels, restaurants, gas stations, theaters, and stadiums, it is clear that Congress intended the statute to reach only the listed facilities and other similar physical structures, not to "regulate a wide spectrum of consensual human relationships." *Welsh*, 993 F.2d at 1270.

This emphasis on actual physical facilities is reinforced by the cases rejecting Title II claims against membership organizations. In *Welsh*, the plaintiffs, who were atheists, claimed that the Boy Scouts of America violated Title II in denying them membership, arguing that the Boy Scouts were a "place of ... entertainment." The majority of the Seventh Circuit panel in *Welsh* concluded that the Boy Scouts of America is not a "place of public accommodation" under Title II because it is not "closely connected to a particular facility." *Welsh*, 993 F.2d at 1269.[7] In doing so, the *Welsh* majority distinguished the Boy Scouts from membership organizations in which membership "functions as a 'ticket' to admission to a facility or location," that have been consistently held to be places of public accommodation under Title II. *Id.* at 1272.[8] Similarly, the Ninth Circuit in *Clegg* held that the Cult Awareness Network, a nonprofit organization that provides information to the public concerning cults and supports former cult members, was not a "place of public accommodation" because it had "no affiliation with any public facility." *Clegg*, 18 F.3d at 755. In short, it is clear from the cases considering membership organizations that status as a place of public accommodation under Title II requires some connection to some specific physical facility or structure. As noted in *Welsh* and *Clegg*, to ignore this requirement is to ignore the plain language

---

7. Notably, the Boy Scouts have been deemed a place of *public accommodation under the* broader New Jersey *state* public accommodation law. *See Boy Scouts of America v. Dale*, 530 U.S. 640, 656–57, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000). The Supreme Court in *Dale* noted that the New Jersey Supreme Court's failure to "even attempt[ ] to tie the term 'place' to a physical location" increased the potential for a conflict between the state public accommodations laws and the First Amendment. *Id.* at 657, 120 S.Ct. 2446. In doing so, the Supreme Court implicitly endorsed the rationale behind a "physical facility" requirement in federal Title II law. *See id.* at 657 n. 3, 120 S.Ct. 2446 (noting that the New Jersey Supreme Court stands alone in its

treatment of the Boy Scouts as a place of public accommodation).

8. *See, e.g., Smith v. YMCA of Montgomery*, 462 F.2d 634, 636 (5th Cir.1972) (holding that Title II reaches YMCA that operates gymnasiums, a health club, and swimming pool); *Nesmith v. YMCA of Raleigh, N.C.*, 397 F.2d 96, 99–100 (4th Cir.1968) (same); *United States v. Lansdowne Swim Club*, 713 F.Supp. 785, 790 (E.D.Pa.1989), *aff'd*, 894 F.2d 83 (3rd Cir. 1990) (club operated swimming pool); *Durham v. Red Lake Fishing & Hunting Club, Inc.*, 666 F.Supp. 954, 959 (W.D.Tex.1987) (club provided access to 400 acres of land for hunting and fishing).

of the statute and to render the list of example facilities provided by the statute superfluous. *See Welsh*, 993 F.2d at 1269; *Clegg*, 18 F.3d at 755.

In arguing that places of public accommodation are not limited to actual physical facilities under Title II, plaintiff turns to the case law interpreting the analogous "place of public accommodation" provision under Title III of the Americans With Disability Act (ADA). *See* 42 U.S.C. § 12182 (prohibiting discrimination in any place of public accommodation on the basis of disability); § 12181(7) (defining "place of public accommodation"). While the case law concerning places of public accommodation under the ADA is more abundant than that under Title II, it is not entirely uniform. Yet, a detour into the parallel ADA cases is instructive and ultimately supports the conclusion that "places of public accommodation" must consist of, or have a clear connection to, actual physical facilities or structures.

The circuits are split regarding the essential question whether a place of public accommodation under the ADA must be an actual concrete physical structure. On the one hand, as plaintiff notes, the First Circuit has held that "places of public accommodation" under Title III of the ADA are *not* limited to actual physical facilities.

*See Carparts Distribution Center, Inc. v. Automotive Wholesaler's Assoc. of New England, Inc.*, 37 F.3d 12, 18–20 (1st Cir. 1994) (holding that a trade association which administers a health insurance program, without any connection to a physical facility, can be a "place of public accommodation").[9] On the other hand, the Third, Sixth and Ninth Circuits, in similar cases involving health insurance programs, followed the logic of *Welsh* and *Clegg* in holding that places of public accommodation under Title III of the ADA must be physical places. *See Parker v. Metropolitan Life Insurance Co.*, 121 F.3d 1006, 1014 (6th Cir.1997) (holding that "the clear connotation of the words in § 1218(7) is that a public accommodation is a physical place," because "[e]very term listed in § 12181(7) . . . is a physical place open to public access"); *Ford v. Schering–Plough Corp.*, 145 F.3d 601, 612–13 (3rd Cir.1998) (holding that "the plain meaning of Title III is that a public accommodation is a place," and that § 12181(7) does not "refer to non-physical access"); *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114–16 (9th Cir.2000) (following *Parker* and *Ford*). Thus, it appears that the weight of authority endorses the "actual physical structure" requirement in the ADA context as well.[10]

**9.** In reaching this conclusion, the First Circuit in *Carparts* relied on the ADA's more expansive definition of "place of public accommodation," in particular its inclusion of a "travel service," "insurance office," and "other service establishments" as places of public accommodation *Id.* at 19; 42 U.S.C. § 12181(7). Focusing on these terms, the First Circuit concluded that "Congress clearly contemplated that 'service establishments' include providers of services which do not require a person to physically enter an actual physical structure," and thus that the Title III of the ADA is not limited to "physical structures which person must enter to obtain goods and services." *Id.* at 19–20. Simply put, the *Carparts* court found it irrational to

conclude that Title III of the ADA reaches those who enter an office to purchase insurance services, but not those who purchase them over the mail or by telephone. *Id.* at 19. Notably, Title II of the Civil Rights Act does not include a "travel service," "insurance office," or "other service establishments" in its definition, making the relevance of *Carparts* and its progeny to Title II questionable, at best.

**10.** Yet, *Carparts* has not been completely abandoned. Indeed, some courts have continued to follow its holding and logic in cases involving health insurance programs, including a court in this district. *See Lewis v. Aetna*

Most significantly, two more recent ADA cases involving fact situations much closer to those at bar reaffirm the principle that a "places of public accommodation," even under the ADA's broader definition, must be actual, physical facilities. In one case, the plaintiffs claimed that Southwest Airlines was in violation of the ADA because its "southwest.com" web site was incompatible with "screen reader" programs and thus inaccessible to blind persons. *See Access Now, Inc. v. Southwest Airlines, Co.*, 227 F.Supp.2d 1312, 1316 (S.D.Fla.2002). Thus, the question presented was whether the airline's web site, which serves as an online ticket counter, constitutes a "place of public accommodation" under the ADA. The *Access Now* court held that places of public accommodation under the ADA are limited to "physical concrete structures," and that the web site was not an actual physical structure. *Id.* at 1319. Rejecting the invitation to endorse the *Carparts* approach and apply the ADA to Internet web sites despite their lack of physical presence, the *Access Now* court concluded that "[t]o expand the ADA to cover 'virtual' spaces would create new rights without well-defined standards." *Id.* at 1318.[11] Similarly, in another case, plaintiff contended that the defendant's digital cable system was in violation of the ADA because its on-screen channel guide was not accessible to the visually impaired. *See Torres v. AT & T Broadband, LLC*, 158 F.Supp.2d 1035, 1037–38 (N.D.Cal.2001). Here too, the district court rejected the notion that the digital cable system was a "place of public accommodation," because "in no way does viewing the system's images require the plaintiff to gain access to any actual physical public place," *Id.* at 1038 (citing *Weyer*, 198 F.3d at 1114–16). Furthermore, the *Torres* court sensibly concluded that the mere fact that the digital cable system relied on physical facilities to support and transmit its services did not convert the cable service into a "physical public place." *Id.* at 1038.

In sum, whether one relies on the Title II case law or looks to the broader ADA definition of public place of accommodation, it is clear that the logic of the statute and the weight of authority indicate that "places of entertainment" must be actual physical facilities. With this principle firmly established, it is clear that AOL's online chat rooms cannot be construed as "places of public accommodation" under Title II. An online chat room may arguably be a "place of entertainment," but it is not a physical structure to which a member of the public may be granted or denied access, and as such is fundamentally different from a "motion picture house, theater, concert hall, sports arena, [or] stadium." 42 U.S.C. § 2000a(b)(3). Although a chat room may serve as a *virtual* forum through which AOL members can meet and converse in cyberspace, it is not an "establishment," under the plain meaning of that term as defined by the statute. Unlike a theater, concert hall, arena, or any of the other "places of entertainment" specifically listed in § 2000a(b), a chat room does not exist in a particular physical location, indeed it can be accessed almost anywhere, including from homes, schools, cybercafes and libraries. In sum, although a chat room or other online forum might

---

*Life Ins. Co.*, 982 F.Supp. 1158, 1164 (E.D.Va. 1997).

**11.** *But see Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 559 (7th Cir.1999) (citing *Carparts* approvingly and stating, in dicta, that Title III of the ADA reaches "the owner or operator of a store, hotel, restaurant, dentist's office, travel agency, theater, *Web site*, or other facility (whether in physical space *or in electronic space* )") (emphasis added) (citation omitted).

be referred to metaphorically as a "location" or "place," it lacks the physical presence necessary to constitute a place of public accommodation under Title II. *See Access Now*, 227 F.Supp.2d at 1312 (holding that an airline's online ticket service, which is arguably a "virtual" version of its physical ticket counters, is not a "place of public accommodation" because it is not a "physical concrete structure"); *Torres*, 158 F.Supp.2d at 1038 (holding that a digital cable system is not an "actual physical public place"). Accordingly, even if plaintiff's Title II claim were not barred by § 230's grant of immunity to service providers, it would be fail on the independent ground that AOL's chat rooms are not places of public accommodation.[12]

## V.

■ Plaintiff's breach of contract claim must likewise be dismissed because the contractual rights plaintiff claims are simply not provided for in AOL's Member Agreement. The plain language of the Member Agreement makes clear that AOL is not obligated to take any action against those who violate its Community Guidelines. Thus, the Member Agreement provides that AOL "has the right to enforce them *in its sole discretion*," and that "if you ... violate the AOL Community Guidelines, AOL *may* take action against your account." (emphasis added). The Member Agreement also states that "[y]ou also understand and agree that the AOL Community Guidelines and the AOL Privacy Policy, including AOL's enforcement of those policies, *are not intended to confer, and do not confer, any rights or remedies upon any person.*" (emphasis added). The Member Agreement states that while AOL "reserve[s] the right to remove content that, in AOL's judgment, does not meet its standards or does not comply with AOL's current Community Guidelines ... AOL is not responsible for any failure or delay in removing such material."

In light of this plain contractual language, plaintiff cannot claim that AOL breached a duty to protect him from the harassing speech of others; the Member Agreement expressly disclaims any such duty. Furthermore, as the Third Circuit noted in *Green*, AOL's disclaimer of any obligation to enforce its Community Guidelines is perfectly in line with the evident Congressional intent of § 230, namely to ensure that service providers are not held responsible for content provided by third parties. *See Green*, 318 F.3d at 471 (noting that "the Member Agreement between the parties tracks the provisions of section 230"); *see also Zeran*, 129 F.3d at 331 (noting that Congress enacted § 230 to ensure that service providers could self-regulate the dissemination of offensive material without exposing themselves to liability *as publishers as a result of such self-regulation*).

Furthermore, plaintiff's attempt to cast this claim as a third-party beneficiary

---

12. Plaintiff's Title II claim suffers additional infirmities, as well. First, plaintiff requests compensatory and punitive damages for his Title II claim, but he is not entitled to recover damages under Title II. *See Newman v. Piggie Park Enters.*, 390 U.S. 400, 401, 88 S.Ct. 964, 19 L.Ed.2d 1263 (holding that "[w]hen a plaintiff brings an action under [Title II], he cannot recover damages"). Second, because plaintiff cancelled his AOL membership well before this action was filed, he may not be able to show "continuing, present adverse effects" and therefore may lack standing to seek injunctive relief. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). Finally, construing Title II as plaintiff requests, to require that AOL censor or limit the speech of its members, may well cause the statute to run afoul of the First Amendment. *See Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 579, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995).

claim is unavailing. Under the Member Agreement, AOL no more owes a duty to other AOL members to enforce its Community Guidelines than it does with respect to plaintiff.

### E.

█ Finally, plaintiff's belatedly-raised First Amendment claim is easily disposed of at this stage. In essence, plaintiff claims that AOL violated his First Amendment rights by issuing him warnings and briefly terminating his account, allegedly in response to his pro-Islamic statements. Yet, even assuming the truth of plaintiff's allegations, the First Amendment is of no avail to him in these circumstances; it does not protect against actions taken by private entities, rather it is "a guarantee only against abridgment by government, federal or state." *Hudgens v. NLRB*, 424 U.S. 507, 513, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976). Plaintiff does not argue that AOL is a state actor, nor is there any evident basis for such an argument. *See Green*, 318 F.3d at 472 (noting that AOL is a "private, for profit company" and rejecting the argument that AOL should be treated as a state actor); *Cyber Promotions Inc. v. American Online, Inc.*, 948 F.Supp. 436, 441–44 (E.D.Pa.1996) (rejecting the argument that AOL is a state actor). Accordingly, because AOL is not a state actor, plaintiff's First Amendment claim must be dismissed.

An appropriate order will issue.